IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT DALE ALEXANDER,

2:13-CV-1176-PK

FINDINGS AND
RECOMMENDATION

Plaintiff,

v.

MAX WILLIAMS, COLETTE PETERS,
STEVE SHELTON, MICHAEL GOWER,
BILL HOEFEL, LINDA GRUENWALD,
BRENDA WHELAN, and FRANKE,

Defendants.

PAPAK, Magistrate Judge:

Plaintiff Robert Dale Alexander, an inmate of the Two Rivers Correctional Institution

("TRCI"), filed this action *pro se* against defendants Max Williams, Colette Peters, Steve

Shelton, Michael Gower, Bill Hoefel, Linda Gruenwald, Brenda Whelan, and "Mr. Franke" in

Page 1 - FINDINGS AND RECOMMENDATION

their individual and official capacities on July 12, 2013. Defense counsel returned a waiver of

service of process as to defendants Williams, Peters, Shelton, Gower, Whelan, and Franke on

October 1, 2013, representing that he did not decline to waive service of process as to any

defendant; other than that representation, counsel's waiver was silent as to defendant Hoefel.[1]

On January 13, 2014, Judge Simon granted Alexander's motion (#19) to dismiss his own

claims against defendant Franke with prejudice.[2]  Also on January 13, 2014, Judge Simon

granted the motion (#14) to dismiss filed by defendants Williams, Peters, Shelton, Gower,

Whelan, and Franke as to all of Alexander's claims against defendants Williams, Peters, Shelton,

Gower, and Whelan with leave for Alexander to amend his pleading within thirty days to cure the

identified deficiencies in his allegations against those defendants. Alexander did not amend or

seek leave to amend his pleading within thirty days of the date Judge Simon's order issued, and

on that basis I construe Alexander's claims against defendants Williams, Peters, Shelton, Gower,

and Whelan as dismissed.[3]  By and through his complaint, Alexander alleges the liability of

remaining defendants Hoefel and Gruenwald in two separate claims pled under 42 U.S.C. § 1983

for the violation of his Eighth Amendment rights, each in connection with medical treatment

allegedly necessary to treat ulcerative colitis and/or proctitis. This court has federal-question

jurisdiction over Alexander's claims pursuant to 28 U.S.C. § 1331.

Now before the court is defendant Gruenwald's motion (#66) for summary judgment as to

---

[1] Defendant Hoefel does not appear to have been served personally and has not made any appearance in connection with this action.

[2] Judgment has not yet been entered as to Alexander's claims against Franke.

[3] Judgment has not yet been entered against defendants Williams, Peters, Shelton, Gower, and Whelan.

Page 2 - FINDINGS AND RECOMMENDATION

each of Alexander's two claims. I have considered the motion and all of the pleadings and papers on file. For the reasons set forth below, Gruenwald's motion should be granted, and summary judgment entered in favor of both remaining defendants.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing*

Page 3 - FINDINGS AND RECOMMENDATION

*Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiff Alexander is an incarcerated prisoner housed at all material times at the Two Rivers Correctional Institution.

Defendant Williams was the Director of the Oregon Department of Corrections ("ODOC") from before the events complained of in this action through approximately January 2012. Defendant Peters has been the Director of ODOC since early 2012. Defendant Shelton is the Medical Director of ODOC. Defendant Gower is the Assistant Director at ODOC. Defendant Whelan is a Nurse Manager at TRCI. Defendant Franke is the Superintendent at TRCI. As noted above, Alexander's claims against defendants Williams, Peters, Shelton, Gower, Whelan, and Franke have been dismissed, although judgment has not yet been entered as to those defendants.

Linda Gruenwald is a Nurse Practitioner employed by ODOC at TRCI. She has worked in that capacity from approximately 2001 through the present. Defendant Hoefel is a Medical Services Administrator at ODOC. Alexander alleges Gruenwald's direct involvement in the alleged deprivations of his rights under the Eighth Amendment; Alexander neither alleges Hoefel's involvement in the alleged deprivations nor offers evidence thereof.

/ / /

/ / /

/ / /

/ / /

Page 4 - FINDINGS AND RECOMMENDATION

## II.   Material Facts[4]

### A.   The Administrative Remedy Program at TRCI

Alexander has at all material times been housed at TRCI.  At TRCI, Alexander had available to him a three-level grievance procedure consistent with the regulations set forth in Chapter 292, Division 109 of the Oregon Administrative Rules.

Pursuant to the TRCI grievance procedures and applicable Oregon Administrative Rules, "[i]f an inmate is unable to resolve an issue through informal communications, [the] inmate may seek resolution of the issue by submitting a written grievance using the department's approved inmate grievance form (CD 117)."  OAR-291-109-0140(1)(a).  Any such grievance "must include a complete description of the incident, action, or application of the rule being grieved, including date and approximate time," and should be accompanied by any referenced documents. OAR-291-109-0140(1)(b).  Matters, actions, and incidents that an inmate may properly grieve are the "misapplication of any administrative directive or operational procedure," the "lack of an administrative directive or operational procedure," any "unprofessional behavior or action which may be directed toward an inmate by an employee or volunteer of [ODOC] or the Oregon Corrections Enterprises," any "oversight or error affecting an inmate," any "program failure as defined in . . . OAR-291-077-0020," except where such failure was caused by the inmate's misconduct, or the "loss or destruction of [the inmate's] property. . . ."  OAR-291-109-0140(2). "An inmate grievance may request review of just one matter, action, or incident per inmate grievance form."  OAR-291-109-0140(1)(d).  Similarly, inmates are not permitted to grieve the

---

[4] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

actions of more than one ODOC employee through a single grievance form, but rather must file

one grievance form per ODOC employee whose actions are the subject of the inmate's challenge.

*See* OAR-291-109-0140(3)(e).  In addition, inmates are not permitted to grieve any claim or issue

"that the inmate is pursuing in pending litigation in state or federal courts."

OAR-291-109-0140(3)(f).  A grievance will not be processed unless it is received by the

applicable grievance coordinator on form CD 117 "within 30 calendar days of the date of the

incident giving rise to the grievance."  OAR-291-109-0150(2).

Upon receipt of an inmate grievance, a grievance coordinator is required to "assign the

grievance a number and record its receipt in an inmate grievance log" and to "send a grievance

receipt to the inmate."  OAR-291-109-0160(1) and (1)(a).  The grievance coordinator is then

required to coordinate with the ODOC employee best suited to respond to the grievance, and to

send the inmate's grievance to that person "for reply."  OAR-291-109-0160(1)(b).  The response

must "be returned to the grievance coordinator for processing within 21 calendar days."

OAR-291-109-0160(1)(c).  Following such processing, the grievance coordinator is required to

send the inmate copies of both the grievance and the response, and to retain copies for the

grievance coordinator's files, all within "45 days from the date the grievance was received" by the

grievance coordinator, "unless further investigation is necessary."  OAR-291-109-0160(2).  In the

event the grievance coordinator fails to complete processing of the grievance within 45 days of

its receipt, "the grievance coordinator will make an effort to notify the inmate of the status of the

grievance."  *Id.*  "If the inmate does not receive a response within the allotted time frame, he/she

may contact the grievance coordinator."  *Id.*

"If at any time the grievance coordinator determines the inmate has pursued his/her

Page 6 - FINDINGS AND RECOMMENDATION

grievance through state or federal courts, the grievance process will cease and the grievance will be returned to the inmate." OAR-291-109-0160(4). "A grievance that has been returned to [an] inmate by the grievance coordinator for procedural reasons cannot be appealed." OAR-291-109-0160(5).

An inmate may appeal the institutional response to the inmate's grievance by and through "the grievance appeal form (CD 117c)." OAR-291-109-0170(1)(a). Any such appeal "must be submitted to the grievance coordinator together with the original grievance, attachments, and staff response(s)." *Id.* The scope of the originally submitted grievance cannot be expanded on appeal, and the inmate is not permitted to add new information regarding the grieved incident on appeal, except where such information was unavailable to the inmate at the time the original grievance was filed. *See id.* Any such appeal must be received by the grievance coordinator "within 14 days from the date that the grievance response was sent to the inmate from the grievance coordinator." OAR-291-109-0170(1)(b). The grievance coordinator is required to send the appeal to the "functional unit manager," who is required to respond to the appeal "within 30 calendar days." *Id.* The grievance coordinator is then required to send the functional unit manager's appeal response to the inmate. *See* OAR-291-109-0170(2)(c).

In the event an inmate wishes to appeal the functional unit manager's decision regarding a grievance appeal, the inmate may do so "using the grievance appeal form (CD 117c)." OAR-291-109-0170(2)(a). Any such appeal "must be submitted to the grievance coordinator together with the original grievance, attachments, staff responses, and documentation related to the first grievance appeal." *Id.* The grievance coordinator must receive any such appeal "within 14 calendar days from the date that the first grievance appeal response was sent to the inmate

Page 7 - FINDINGS AND RECOMMENDATION

from the grievance coordinator." OAR-291-109-0170(2)(c). As with the first appeal, appeal of

the functional unit manager's response cannot expand the scope of the original grievance, and

cannot adduce new information regarding the originally grieved incident, except where such

information was unavailable to the inmate at the time the original grievance or first appeal was

filed. *See* OAR-291-109-0170(2)(a). The grievance coordinator is required to forward any such

appeal to "the Assistant Director having authority to review and resolve the issue." *Id.*

The Assistant Director with such authority is required to respond to any such appeal from

a functional unit manager's grievance appeal response "within 30 calendar days."

OAR-291-109-0170(2)(c). "The Assistant Director's . . . decision on an inmate's grievance

appeal is FINAL, and is not subject to further [administrative] review." OAR-291-109-

0170(2)(d).

## B.    Facts Underlying the Parties' Dispute

Alexander was transferred to TRCI from the Snake River Correctional Institution

("SRCI") on March 23, 2011. It appears that while housed at SRCI, Alexander had been

diagnosed with ulcerative colitis and proctitis, and was prescribed Konsyl fiber (a dietary

supplement containing psyllium seed husk fiber) to help control the symptoms of that condition.

Following his transfer to TRCI, on or around April 26, 2011, the TRCI Therapeutic Level of

Care Committee (the "TLCC") denied Alexander's request for a renewal of his Konsyl fiber and

recommended that he raise the level of fiber in his diet instead.

On or around April 28, 2011, Alexander timely filed a grievance regarding the failure to

renew his prescribed fiber on form CD 117 as follows:

> \* On April 26, 2011 I got some progress notes from my medical file and found out
> that the Fiber was not renewed but denied at (TLC) by Gruenwald, A <u>Nurse</u>.

Page 8 - FINDINGS AND RECOMMENDATION

    * This was to help keep things moving as stated by Steve Shelton.
    * Dr. Gulick at (SRCI) said it would be renewed without any problem on 3/15/11.
    * But it was not.

The grievance was stamped as "accepted" by the grievance coordinator as of May 11, 2011.  On

May 23, 2011, Nurse Manager Whelan formally responded to Alexander's grievance on form CD

117b as follows:

> Mr. Alexander, a review of your medical file indicates that you were seen by Dr.
> Gulick on March 15, 2011 [while still housed at SRCI].  In the progress notes
> from this date it is noted that Dr. Gulick recommended that Metamucil [a dietary
> supplement containing psyllium seed husk fiber] be continued.  Metamucil is
> available on canteen and is not in our formulary so it has to be presented to the
> Therapeutic Level of Care Committee (TLC).  The request for Metamucil renewal
> was presented to the TLC Committee on April 26, 2011 and denied.  It was not
> found to be medically indicated as you can increase the fiber in your diet by
> ordering veggie trays from food services for lunch and/or dinner.  The TLC
> Committee is comprised of several practitioners from various institutions so this
> was not a decision made by Ms Gruenwald, Nurse Practitioner.  If you have
> further concerns please address them at sick call.

On or around June 1, 2011, Alexander timely appealed Whelan's response on form CD 117c as

follows:

>     * The fib[er] was prescribed to help prevent another problem with proctitis
> approved by TLC at (SRCI) and prescribed by a doctor.
>     * I have done the veggie trays and I don't have teeth for them.
>     * All this has been discussed with Dr. Gulick at (SRCI) who told me that a Fib[er]
> renewal would not be a problem at TRCI.
>     * Obviously it is a problem at (TRCI).
>     * This was supposed to be already resolved.

Alexander's first appeal of the response to his grievance was stamped as "accepted" by the

grievance coordinator effective June 3, 2011.  On July 19, 2011, Medical Director Shelton

responded to Alexander's appeal via letter in relevant part as follows:

> Your medical file was reviewed by Mrs. Whelan, RN-Medical Services manager
> at Two Rivers Correctional Institution.  Review indicated your request for fiber
> was presented to the Therapeutic Level of Care Committee (TLC) for review.  The

Page 9 - FINDINGS AND RECOMMENDATION

TLC denied this request due to adequate fiber being available in your daily diet options at TRCI. The veggie tray can be cooked to allow for easier chewing, however, your medical file does not indicate you are currently prescribed any type of soft diet due to dental issues. If you need a softer diet due to dental issues please contact dental via an inmate communication.

Your medical file does not indicate any current issues with Proctitis, should you have issues please address them at sick call.

On or around August 8, 2011, Alexander timely appealed Shelton's response on form CD 117c as follows:

* Fiber/Metamucil was ordered by Dr. Gulick at (SRCI) to prevent another many months of Rectal bleeding caused by Proctitis.
* This issue was address[ed] previously by Dr. Shelton who signed his name to a response stating I would be getting Fiber & Metamucil to treat the Proctitis.
* This issue was addressed previously By Micheal Gower who signed his name to a response stating I would be getting Fiber/Metamucil to treat Proctitis.
* Now I'm on treatment that doesn't work.

Alexander's second-level appeal of the response to his first appeal was stamped as "accepted" by the grievance coordinator effective August 15, 2011. On August 25, 2011, Assistant Director Gower responded to Alexander's appeal via letter as follows:

A review of your medical file indicated your request for fiber was presented to the Therapeutic Level of Care Committee (TLC) for review. This request was presented and discussed by a panel of practitioners on the TLC committee. The recommendation of the committee is to purchase your own fiber or eat items off your tray that are high in fiber. An option is for you to order a veggie tray for lunch and dinner. The veggie tray is high in fiber and is lower in fat and cholesterol. For concerns regarding your dental needs please address them at [sic] via inmate communication to dental services.

As discussed in greater detail below, Gower's response constituted the final decision regarding Alexander's grievance of April 28, 2011, exhausting available administrative remedies in connection with the discontinuance of Alexander's prescribed fiber supplement.

On January 11, 2012, Alexander presented at sick call requesting a refill of Milk of

Magnesia (magnesium hydroxide in a water suspension), apparently for the purpose of controlling his colitis/proctitis symptoms.  TRCI medical staff conferred with Alexander's "provider" and determined that there was no "order" on file for Alexander to receive Milk of Magnesia.  Staff declined to provide Alexander with Milk of Magnesia and instead instructed him to eat a daily veggie tray, to double his usual daily water intake, and to walk "excessively" in his cell and in the exercise yard, as a means of controlling his symptoms.

On January 27, 2012, Alexander against presented at sick call, complaining (*inter alia*) of painful, bloody bowel movements and rectal discomfort.  Gruenwald noted on Alexander's chart that he required treatment for proctitis, and on January 30, 2012, TRCI staff advised Alexander to take lactulose (pursuant to a standing order) up to four times a day to promote bowel movements.  Staff noted that Milk of Magnesia might be inadvisable in light of the standing lactulose "protocol."

On February 2, 2012, Alexander presented at sick call primarily regarding psoas pain but additionally complaining of abdominal pain and constipation, indicating that he passed one stool every three days, and that his stool contained blood and mucous.  Alexander reported similar complaints at sick call on February 13, 2012.  On February 20, 2012, TRCI medical staff requested a stool sample for analysis, and on March 2, 2012, Alexander returned a three-day-old sample.  Staff determined that the sample was too old for useful analysis and requested another sample, instructing him to return it promptly.  On March 5, 2012, Alexander provided a stool sample that TRCI medical staff sent to a lab for analysis.  The analysis was positive for hepatitis C virus.

Alexander complained of rectal bleeding again at sick call on May 18, 2012, and again on

May 21, 2012. On May 21, 2012, Alexander reported that he was eating a daily veggie tray but that his symptoms had been better controlled when he was taking a fiber supplement. On May 28, 2012, Alexander's providers requested TLCC approval a three-month period of fiber supplements to combat Alexander's colitis/proctitis symptoms; the TLCC approved the request May 29, 2012. TRCI medical staff provided Alexander with a three-month course of Konsyl fiber supplements beginning June 7, 2012.

On June 13, 2012, Alexander again presented at sick call complaining of rectal bleeding and of abdominal cramps. Alexander requested surgery in connection with his symptoms, and medical staff set up an appointment for Alexander to discuss his symptoms with a provider. It appears that Alexander did not attend the scheduled appointment.

On July 18, 2012, Alexander presented at sick call complaining, *inter alia*, of bloody, loose stools. Notwithstanding that complaint, Alexander reported to TRCI medical staff on that date that the "Fiber [supplement] really help[ed]" his symptoms. Staff ordered another stool sample to rule out the possibility that an infection was causing his symptoms. Because for unexplained reasons the stool sample was not returned, on July 24, 2012, staff re-ordered the stool sample. On July 25, 2012, Alexander again reported at sick call complaining of "lots of rectal bleeding" and that he was passing "lots of mucous & blood & uncontrollable stools." That same date, Alexander's providers requested TLCC approval for a colonoscopy to investigate the etiology of Alexander's symptoms.

Alexander reported to sick call on July 27, 2012, reporting "a lot of rectal bleeding," and was advised that his lab results were pending. The TLCC approved the requested colonoscopy July 31, 2012.

Page 12 - FINDINGS AND RECOMMENDATION

On August 3, 2012, Alexander reported improvement in his symptoms after taking his fiber supplement twice daily as ordered since June 7, 2012. On August 15 and 17, 2012, Alexander requested that his approved colonoscopy be deferred to permit other measures to control his symptoms to be tested.

On September 7, 2012, Alexander presented at sick call, reporting "a change in vision" over the three preceding weeks. The reported change was present in the right eye but not the left. TRCI medical staff made an appointment for Alexander to consult with a "provider" on September 12, 2012. The condition worsened on September 9, 2012, and TRCI medical staff conducted an eye examination on that day and moved his provider appointment up to September 10, 2012. On September 10, 2012, a TRCI staff physician diagnosed Alexander with a possible retinal tear and referred him to outside physician Dr. Charles Sung for further examination and treatment. Dr. Sung saw Alexander that same day, diagnosed him with retinal detachment, and scheduled a retinal surgery the following day. Alexander underwent successful retinal surgery on September 12, 2012. Alexander consulted with Dr. Sung for post-operation follow-ups on September 12 and 13, 2012. On September 13, 2012, Dr. Sung prescribed Alexander "preservative-free artificial tears" and, that product not being in TRCI's stocks of supplies, TRCI medical staff offered Alexander "Lubrifresh eye ointment." Alexander refused the alternate medication.

Also on September 13, 2012, TRCI medical staff prescribed a two-day regimen of Milk of Magnesia to help alleviate Alexander's ongoing colitis/proctitis symptoms. On September 18, 2012, Alexander presented at sick call complaining of constipation and was again prescribed Milk of Magnesia. From September 13 to 18, 2012, Alexander received treatment for his eye

from TRCI medical staff.

On September 22, 2012, Alexander grieved the purported delay in his approved colonoscopy. Because (as discussed in greater detail below) it is clear that any delay in Alexander's colonoscopy is not within the scope of either of Alexander's claims (however those claims may be construed), I find that Alexander's grievance of the purported delay is immaterial to the parties' dispute, other than to whatever extent it may lend support (if any) to Alexander's theory that defendant Gruenwald exhibited deliberate indifference to his serious medical needs. In consequence, I do not herein describe further administrative proceedings in connection with the grievance of September 22, 2012.

On September 26, 2012, Alexander reported to TRCI medical staff that he had spent "all" the previous day on the toilet experiencing rectal bleeding, although he also reported that he had "stopped bleeding in [the] last week." He further reported that he was "messing himself," although staff recorded that there was "no evidence of him soiling himself." Alexander advised medical staff that he refused the approved colonoscopy (notwithstanding his grievance of September 22, 2012) and preferred to treat his symptoms with medication.

On October 3, 2012, Alexander complained of itchiness in his right eye. TRCI medical staff provided him with eye drops that same day.

On October 8, 2012, Alexander requested prednisone "to help stop the bloody mucous from passing all the time." On October 10, 2012, TRCI medical staff sent Alexander a kyte regarding the approved colonoscopy in an effort to obtain his consent to the procedure. On October 12, 2012, Alexander requested more information regarding the colonoscopy procedure, and reported that he was passing as many as fourteen "bloody/mucous" stools daily. On October

Page 14 - FINDINGS AND RECOMMENDATION

15, 2012, Alexander presented at sick call requesting a "low residue" diet and a prescription for prilosec in connection with his symptoms. On October 17, 2012, a TRCI staff physician determined that prilosec was "not indicated for bloody mucous stools," but agreed to order a low residue diet for Alexander pursuant to his request. Staff provided Alexander with a hand-out regarding colonoscopies.

On October 24, 2012, Alexander presented at sick call complaining of "flakes of light on his right eye since his surgery." Alexander consulted with outside physician Dr. Steve Evers on October 25, 2012. Dr. Evers' examination revealed no new damage to Alexander's right eye. Dr. Evers examined Alexander again on November 7, 2012, with similar results. On November 8, 2012, Alexander consulted again with Dr. Sung, who recommended an additional surgical procedure to remove "additional silicone" from Alexander's right retina.

On November 14, 2012, Alexander presented at sick call requesting more fiber supplements, which he characterized as having "worked wonderful" in the past, and reporting that because he only had six teeth, he could not eat veggie trays.

On or around November 29, 2012, Alexander filled out and signed a second form CD 117 grieving the April 2011 failure to renew his fiber supplements as follows:

> * On or about 11/15/12 the rectal bleeding I've been going through for over a year has pretty much stopped.
> * The problem has caused me to have many months of uncontrolled rectal bleeding, mucous ejection, pain, and having to use the toilet up to 40 times in a day. Because L. Gruenwald refused to renew the Konsyl Fiber when I got here from SRCI in March of 2011.

The grievance was stamped as "received" by the grievance coordinator as of May 9, 2013. No party offers any explanation for the approximate six-month delay between the date Alexander ostensibly signed the grievance and the date it was ostensibly received by the grievance

Page 15 - FINDINGS AND RECOMMENDATION

coordinator at TRCI, but it appears more likely than not that Alexander did not file the grievance until approximately May 2013.

On December 2, 2012, Alexander underwent a colonoscopy procedure. Alexander reported to the physician conducting the procedure that since his transfer to TRCI his "rectal bleeding had diminished," and further reported that during a January 2011 colonoscopy (performed while Alexander was housed at SRCI, before the events material to Alexander's claims) he had had polyps removed from his colon, although there is no medical record of any such polypectomy. The results indicated some inflammation of the colon, no colonal polyps, and minimal hemorrhoids, and were consistent with a diagnosis of "[p]robable colitis." Subsequent biopsies of four random samples taken from Alexander's colon yielded results consistent with either colitis or inflammatory bowel disease.

On December 5, 2012, Alexander consulted again with Dr. Sung, who reiterated his recommendation that Alexander undergo an additional surgical procedure to remove silicone.

TRCI medical staff reviewed the results of Alexander's colonoscopy and biopsies with him on December 19, 2012. Gruenwald ordered fiber supplements for Alexander, and apparently advised him that he would be prescribed a course of sulfasalazine to alleviate his bowel inflammation.

On December 20, 2012, Alexander consulted again with Dr. Sung, who once again reiterated his recommendation that Alexander undergo an additional surgical procedure to remove silicone. The surgery was scheduled for January 8, 2012.

On December 28, 2012, Alexander reported to sick bay to inquire regarding the fact that he had not yet been started on sulfasalazine. TRCI medical staff advised him that he was

scheduled to start the course on January 3, 2013. On January 3, 2013, due to an error the medication was misplaced on the "med cart" and was not provided to Alexander, but the error was corrected and medical staff began providing Alexander with sulfasalazine on January 4, 2013. On January 7, 2013, Alexander presented at sick call and reported that he "ha[d] not been taking [his] sulfasalazine" because he believed it was a blood-thinner and that he was not supposed to be taking blood thinners due to the scheduled surgery for his eye condition.

Alexander underwent an additional surgical procedure with Dr. Sung on January 8, 2012, to remove silicone from his right eye. The surgery was successful, and Alexander visited Dr. Sung for a follow-up appointment on January 9, 2012.

On January 11, 2013, Alexander again presented at sick call, reporting that "ever since he started taking Sulfasalazine it has given him diarrhea" and asking whether he should continue taking it. TRCI medical staff advised him to continue taking it, in part on the ground that it was not yet possible to determine whether his reported diarrhea was the same diarrhea he had been experiencing prior to starting the course of sulfasalazine or was instead a side effect of the new medication. On January 16, 2013, Alexander again reported diarrhea, which he attributed to the sulfasalazine. TRCI medical staff discussed different care options with Alexander, including "just see[ing] how fiber works." On January 22 and 23, 2013, Alexander presented at sick call complaining of rectal swelling and painful bowel movements and requesting suppositories and ointment.

On January 30, 2013, Alexander requested to be permitted to take sulfasalazine in the mess hall, so that he could take it with food; the medical records are silent as to whether the request was granted, but it was apparently not repeated.

Page 17 - FINDINGS AND RECOMMENDATION

On February 22, 2013, Alexander requested an appointment to discuss possible changes to his medications. On that same date, a TRCI medical staff member instructed him to continue taking sulfasalazine. On February 23, 2013, Alexander repeated his request. Alexander met with TRCI medical staff to discuss his issues with his medications on February 27, 2013, and staff noted that they would discuss his issues with a "provider." It appears that in response to his complaints, his prescribed dosage of sulfasalazine was decreased.

On March 3, 4, and 6, 2013, the reduced dosage apparently having been ineffective in controlling Alexander's symptoms, Alexander requested that his sulfasalazine be discontinued altogether. Alexander met with TRCI medical staff to discuss the issue on March 8, 2013, indicating that the reduced dosage had not made any difference in his symptoms, and reporting that he continued to take fiber supplements twice daily. On March 15, 2013, Gruenwald reduced his dosage further, and indicated that if his symptoms of diarrhea persisted, and his blood counts remained good, she would consider discontinuing the medication altogether. On March 24, 2013, Alexander requested once again that the medication be discontinued.

Gruenwald offers the declaration of Robert Hillmick that "[o]n March 26, 2013, . . . Alexander filed a grievance for the alleged ineffectiveness of his ulcerative colitis treatment . . . ." No party has offered into evidence the grievance itself, or of any institutional response thereto. Hillmick declares that Alexander did not timely pursue available appeals in connection with the grievance of March 26, 2013, and Alexander offers no evidence to dispute Hillmick's declaration. To whatever extent, if any, that the issue underlying the grievance of March 26, 2013, may have differed from the issue underlying the grievance of April 28, 2011, I find on the basis of the evidence that Alexander did not pursue all available levels of appeal that Alexander

Page 18 - FINDINGS AND RECOMMENDATION

did not exhaust administrative remedies in connection with that issue.

On April 1, 2013, Alexander renewed his request that his sulfasalazine be discontinued. Alexander's medical records contain a "Physician's Order" dated April 2, 2013, indicating that his providers should discontinue sulfasalazine, but also contain a "progress note" dated April 3, 2013, indicating that TRCI medical staff instructed Alexander to continue taking his prescribed sulfasalazine. It appears likely (but cannot be conclusively established from the evidentiary record) that it took TRCI medical staff a matter of a few days to process the Physician's Order of April 2, 2013, and that notwithstanding the progress note of April 3, 2013, Alexander's sulfasalazine was cut off at or around this time.

On May 13, 2013, Alexander presented at sick call complaining of inability to focus his right eye. TRCI medical staff noted that Alexander had a scheduled appointment to consult with Dr. Sung on May 16, 2013, and indicated that he could discuss the problem with Dr. Sung in the course of that appointment.

On May 14, 2013, the TRCI grievance coordinator stamped Alexander's grievance dated November 29, 2012, as "denied" and responded to it via memo as follows:

> The grievance you submitted is being returned to you due to non-compliance with the Department of Corrections (DOC) Rule 291-109 Grievance Review System.
>
> Your grievance was submitted outside the time frame allowed by the rule.

On May 16, 2013, Alexander consulted with Dr. Sung. At that appointment, Dr. Sung performed laser surgery on Alexander's right eye to correct his problem with inability to focus.

Gruenwald offers the declaration of Robert Hillmick that "[o]n May 28, 2013, . . . Alexander filed a grievance alleging that he was not being treated for eye pain. . . ." No party has offered into evidence the grievance itself, or of any institutional response thereto. Hillmick

Page 19 - FINDINGS AND RECOMMENDATION

declares that Alexander did not timely pursue available appeals in connection with the grievance of May 28, 2013, and Alexander offers no evidence to dispute Hillmick's declaration. I find on that basis that Alexander did not exhaust administrative remedies in connection with the issue grieved on May 28, 2013.

On or around June 3, 2013, Alexander attempted to appeal the denial of his grievance dated November 29, 2012, on form CD 117c as follows:

> * I'm appealing the Grievance, I do not agree with its denial.
> * I have no control over what happens to my papers once they go into the kyte box.
> * This was raised in the griev[ance] [and] needs to be addressed, not shoved under the carpet as per usual.

On June 5, 2013, Alexander requested a change in his diet and renewal of his fiber supplements. On that date, TRCI medical staff recorded a progress note indicating that Alexander was "unwilling to treat colitis as ordered."

Alexander's attempted appeal of the response to his grievance of November 29, 2012, was stamped as "received" by the grievance coordinator effective June 7, 2013. On June 17, 2013, the grievance coordinator stamped the attempted appeal as "denied" and responded via memo as follows: "A grievance that was denied cannot be appealed."

On or around that same date, June 17, 2013, Alexander filed a new grievance on form CD 117 regarding the April 2011 failure to renew his fiber and/or the January 2012 failure to order him Milk of Magnesia, indicating that those failures had caused the retinal detachment he experienced in September 2012, as follows:

> * I'm basing this Grievance on New information for the cause of my Retinal Detachment.
> * On May 30, 2013, I was taken out to see Dr. Sung (Retinal eye surgeon) who told me that the Retinal detachment I had in September of 2012 was caused by the

Page 20 - FINDINGS AND RECOMMENDATION

extreme cramping I was going through at the time caused by colitis/ulcerative colitis.
* This bout of colitis/ulcerative colitis was caused by L. Gruenwald my medical provider at TRCI refusing to renew medication and discontinuing medication that that [*sic*] would have kept me from having the bout of Ulcerative Colitis that caused the extreme cramping leading to the Retinal detachment.
* The Retinal detachment could have been avoided had I been provided the proper care.

The grievance of June 17, 2013, was stamped as "received" by the grievance coordinator as of June 18, 2003.

On or around June 23, 2013, Alexander attempted a second-level administrative appeal of his grievance of November 29, 2012, on form CD 117c as follows:

* I do not agree with the Griev[ance] being denied.
* I have no control over what happens to my Griev[ance] once it[']s in the kyte box.
* The issue raised in this Grievance needs to be addressed, not shoved under the carpet.

Alexander's attempted second-level appeal of the failure to accept his grievance of November 29, 2012, was stamped as "received" by the grievance coordinator effective June 24, 2013.

On that same date, June 24, 2013, the grievance coordinator stamped Alexander's grievance of June 17, 2013, as "denied," on the grounds that it was a "Duplicate Submission," and advised Alexander that "You may not file more than one grievance regarding a single incident/issue."

On June 27, 2013, the grievance coordinator stamped Alexander's attempted second-level appeal of the failure to accept his grievance of November 29, 2012, as "denied" and responded to Alexander via memo as follows: "A grievance that was denied cannot be appealed." This court need not make any finding as to whether Alexander's efforts to appeal the denial of his grievance of November 29, 2012, could constitute, under all of the circumstances, proper exhaustion of

Page 21 - FINDINGS AND RECOMMENDATION

available administrative remedies, because the issue underlying the grievance did not differ in

any material respect from the issue underlying Alexander's grievance of April 28, 2011, as to

which Alexander had already exhausted available administrative remedies.

Also on June 27, 2013, Alexander attempted to appeal the denial of his grievance of June

17, 2013, via kyte, as follows:

> This grievance is not about treatment for ulcerative colitis, or eye pain. Please
> read this carefully. The Retinal detachment was caused by L. Gruenwald not
> treating the colitis. And as a result caused the eye problem. Your denial doesn't
> make any sense to me. I'm grieving the cause of the retinal detachment being L.
> Gruenwald fault. Please reread this and process the grievance. Dr. Sung told me
> the detachment was caused by the colitis not being treated.

On or around June 28, 2013, the grievance coordinator responded to Alexander's attempted

appeal as follows: "You are still grieving the treatment." On or around July 9, 2013, Alexander

again attempted to appeal the denial of his grievance of June 17, 2013, via form CD 117c, as

follows:

> * I do not agree with the denial of this Grievance.
> *So I'm appealing the denial and the Grievance itself.

On July 10, 2013, the grievance coordinator stamped Alexander's attempted appeal both as

"received" and as "denied," responding to Alexander via memo that "A grievance that has been

denied by the grievance coordinator cannot be appealed." As discussed in greater detail below,

the issue underlying the grievance of June 17, 2013, is largely the same as the issue underlying

the grievance of April 28, 2011, as to which Alexander properly exhausted available

administrative remedies, and to that extent the grievance of June 17, 2013, is superfluous. To the

extent the issue underlying the grievance of June 17, 2013, may differ from the issue underlying

the grievance of April 28, 2011, the grievance of June 17, 2013, was untimely when filed, and

therefore cannot (for reasons discussed in greater detail below) serve to support the conclusion that Alexander properly exhausted available administrative remedies as to the issue grieved. This court therefore need not make any finding as to whether Alexander's efforts to appeal the denial of his grievance of June 17, 2013, could constitute, under all of the circumstances, proper exhaustion of available administrative remedies.

This action was filed July 12, 2013.

## ANALYSIS

As noted above, Alexander brings two Eighth Amendment claims under Section 1983, one premised on defendants' deliberate indifference to his medical needs in connection with his colitis/proctitis, allegedly resulting in colitis/proctitis symptoms of approximately one year's duration, and one premised on defendants' deliberate indifference to his medical needs in connection with the same medical condition of colitis/proctitis, allegedly resulting in his detached retina of September 2012. Both Eighth Amendment claims are pled as arising out of Gruenwald's conduct in discontinuing his fiber supplement in April 2011, TRCI medical staff's failure to provide him with Milk of Magnesia at his request in January 2012, and TRCI medical staff's purported repeated denials of medical treatment in connection with his colitis/proctitis from October 2011 through September 2011. Effectively, the two separately pled claims are best construed either as two counts of a single Eighth Amendment claim or as two discrete theories of damages in connection with a single Eighth Amendment claim. For purposes of the analysis that follows, however, I analyze the claims both as discrete causes of action and as counts (or alternate supporting theories) of a single cause of action in order to determine whether any portion of any of Alexander's claims can survive Gruenwald's dispositive motion on any

construction.

## I.    Prison Litigation Reform Act

Under the Prison Litigation Reform Act ("PLRA"), incarcerated plaintiffs are required to exhaust all administrative remedies available to them within the institutions in which they are housed before bringing any federal action in connection with prison conditions, including such actions brought under 42 U.S.C. § 1983:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, actions brought with respect to "prison conditions" include all actions brought to challenge isolated episodes of unconstitutional or otherwise unlawful misconduct of any kind as well as prisoner petitions challenging conditions of confinement.  *See Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Under the PLRA, the courts lack discretion to consider claims challenging prison conditions, including claims for money damages, except where such claims are filed following complete exhaustion of available administrative remedies, without regard to the nature of the administrative remedies available under such administrative grievance procedures.  *See id.* at 524, *citing Booth v. Churner*, 532 U.S. 731, 739, 740 n. 5, 741 (2001).

Inmates are not required to plead or demonstrate exhaustion before bringing prison-conditions lawsuits.  *Jones v. Bock*, 549 U.S. 199, 216 (2007).  To the contrary, an incarcerated plaintiff's failure to satisfy the PLRA exhaustion requirement is an affirmative defense that is the burden of the defendant in a prison-conditions lawsuit to raise and prove.  *See id.*  Following the Ninth Circuit's *en banc* decision in *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014), the courts of

Page 24 - FINDINGS AND RECOMMENDATION

the Ninth Circuit treat challenges to a prisoner's exhaustion of administrative remedies as

motions for summary judgment if premised on proffered evidence, and as motions to dismiss for

failure to state a claim if premised on the incarcerated plaintiff's pleading alone. *See Albino*, 747

F.3d at 1166. Here, defendant Gruenwald has properly brought her evidence-based challenge to

Roshone's exhaustion of administrative remedies as a motion for summary judgment.

    "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure

to exhaust, a defendant is entitled to summary judgment under Rule 56." *Id.* However, "[i]f

material facts are disputed, summary judgment should be denied, and [following such denial] the

district judge rather than a jury should determine the facts." *Id.* The *Albino* court specified that

the court should act as the finder of fact in connection with an exhaustion challenge "in a

preliminary proceeding," *id.* at 1168, "if feasible, before reaching the merits of a prisoner's

claim," *id.* at 1170. Such preliminary proceeding is to be conducted "in the same manner a judge

rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.*,

which is to say via a plenary evidentiary hearing to be conducted in a manner within the

discretion of the court, *see, e.g., Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d

1280, 1285, 1285 n. 2 (9th Cir. 1977).

    For purposes of the PLRA, "complete exhaustion" of available administrative remedies

requires that an inmate "complete the administrative review process in accordance with [all]

applicable procedural rules, including deadlines. . . ." *Marella v. Terhune*, 568 F.3d 1024, 1027

(9th Cir. 2009), *quoting Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Indeed, as the Supreme Court

established in *Woodford*, "proper exhaustion of administrative remedies. . . 'means using all steps

that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the

merits).'" *Woodford*, 548 U.S. at 90 (emphasis original), *quoting Pozo v. McCaughtry*, 286 F.3d

1022, 1024 (7th Cir. 2002). The *Woodford* court reasoned that to hold otherwise would permit

prisoners to render the PLRA exhaustion requirement "wholly ineffective" by defaulting in the

performance of administrative requirements and then claiming exhaustion by virtue of such

procedural default. *Id.* at 95. Under *Woodford*, only proper exhaustion of administrative

requirements, including compliance with deadlines and performance of all procedural requisites,

is sufficient to satisfy the requirements of the PLRA. *See id.* at 90-91 ("Proper exhaustion

demands compliance with an agency's deadlines and other critical procedural rules. . . .").

Here, as noted above, on or around April 28, 2011, Alexander timely filed a grievance

regarding the April 2011 decision of the TLCC to deny his request for renewal of the fiber

supplements he had been receiving while housed at SRCI. Also as noted above, Alexander

timely and diligently pursued all administrative remedies available to him at TRCI in connection

with that grievance, to full exhaustion. The requirements of the PLRA are therefore satisfied as

to the April 2011 failure to renew Alexander's fiber supplements.

Also as noted above, on or around September 22, 2012, Alexander grieved a purported

delay in a colonoscopy previously approved by the TLCC. That grievance is immaterial to the

issues raised in this lawsuit, as Alexander's claims are in no way premised on delay in his

colonoscopy.

Also as noted above, on or around November 29, 2012, Alexander filled out and signed a

second grievance regarding the April 2011 failure to renew his fiber supplements. Because he

had already grieved precisely that same issue to exhaustion, I find that the grievance dated

November 29, 2012, is likewise immaterial to the issues raised in this lawsuit.

Page 26 - FINDINGS AND RECOMMENDATION

Also as noted above, on March 26, 2013, Alexander filed a grievance regarding "alleged ineffectiveness of his ulcerative colitis treatment," and on May 28, 2013, Alexander filed a grievance regarding "treatment for ulcerative colitis and eye pain." Because the record contains evidence that Alexander failed to pursue all administrative remedies available to him at TRCI in connection with either of those two grievances grievance, and contains no contradictory evidence, pursuant to the PLRA this court lacks discretion to consider the merits of any claim arising out of the grievances of March 26 and May 28, 2013.

Also as noted above, on or around June 17, 2013, Alexander filed a grievance regarding the April 2011 failure to renew his fiber supplements and failure to order him Milk of Magnesia. By and through this grievance, Alexander asserted that his retinal detachment of September 2012 had been caused by these two failures of April 2011. Because Alexander had already grieved the April 2011 failure to renew his fiber supplements to exhaustion, to the extent the grievance of June 17, 2013, is premised on that failure it is superfluous and therefore immaterial to the issues raised in this lawsuit. To the extent premised on the failure to order Milk of Magnesia, the grievance raises a new issue; to that extent, the TRCI grievance coordinator probably erred in denying the grievance as a "Duplicate Submission," and Alexander's subsequent efforts to appeal that denial could be construed as good-faith attempts to exhaust available administrative remedies as to the Milk of Magnesia issue. However, as of June 17, 2013, the time for filing a grievance regarding the January 2012 failure to order him Milk of Magnesia was long past, notwithstanding Alexander's more recent receipt of information regarding damages caused by that failure. *See* OAR-291-109-0150(2). Because the grievance was untimely filed to the extent the underlying issue was the January 2012 failure to order Milk of Magnesia, it is immaterial

Page 27 - FINDINGS AND RECOMMENDATION

whether Alexander thereafter diligently pursued administrative appeal of the grievance

coordinator's denial, and pursuant to the PLRA this court lacks discretion to consider the merits

of any claim arising out of the grievance of June 17, 2013.

In consequence of the foregoing analysis, under the PLRA this court lacks discretion to

consider the merits of either of Alexander's claims to the extent they arise out of any incident

other than the April 2011 failure to renew his fiber supplements. Gruenwald is entitled to

summary judgment in connection with each of Alexander's claims to the extent pled as arising

out of TRCI medical staff's failure to provide him with Milk of Magnesia at his request in

January 2012, and TRCI medical staff's purported repeated denials of medical treatment in

connection with his colitis/proctitis from October 2011 through September 2011, and to that

extent each claim should be dismissed with prejudice as against all remaining defendants.

However, because the PLRA does not require a prisoner to grieve *theories of causation*, whether

Alexander's claims are construed as two separate causes of action or as separate counts of a

single Eighth Amendment claim, the PLRA presents no bar to his pursuit of damages arising out

of his prolonged colitis/proctitis symptoms or out of his detached retina of September 2012, to

the extent that it is his position that those damages were caused by the April 2011 failure to

renew his fiber supplements.

## II.    Statute of Limitations

Defendant Gruenwald notes, correctly, that the statute of limitations applicable to

Alexander's Section 1983 claims is determined by state law, specifically the state-law limitations

period applicable to personal injury torts, *see Harding v. Galceran*, 889 F.2d 906, 907 (9th Cir.

1989), *citing Wilson v. Garcia*, 471 U.S. 261, 269 (1985), and that in Oregon the applicable

Page 28 - FINDINGS AND RECOMMENDATION

limitations period is two years, *see* Or. Rev. Stat. 12.110(1), *see also Cooper v. Ashland*, 871

F.2d 104, 105 (9th Cir. 1989).  Gruenwald argues that because this action was filed July 12,

2013, Alexander's claims are therefore time-barred to the extent they arise out of events taking

place earlier than July 12, 2011.  On that basis, Gruenwald argues that each of Alexander's claims

is time-barred to the extent premised on the April 2011 failure to renew his fiber supplements.

 Gruenwald's argument is not well taken.  The Ninth Circuit has expressly "agreed with

the uniform holdings of the circuits that have considered the question" that the limitations period

applicable to a prisoner's lawsuit must be tolled while the prisoner pursues institutional

administrative remedies.  *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005); *see also id.* at 942-

943.  Here, Alexander pursued material administrative remedies from approximately April 28 to

August 25, 2011, a period of approximately 119 days.  Under *Brown*, therefore, Alexander's

claims are timely filed so long as they arise out of events taking place on or after approximately

March 16, 2011.  To the extent this court may properly consider Alexander's claim or claims

under the PLRA – that is, to the extent his claims are premised on the April 2011 failure to renew

his fiber supplements – they are not time-barred.  Gruenwald's motion should therefore be denied

to the extent premised on the statute of limitations applicable to Alexander's claims.

## III.  Merits Arguments

 As noted above, Alexander's claims are premised on the theory that one or more of the

remaining defendants violated his rights under the Eighth Amendment by failing to renew his

fiber supplements in April 2011 out of deliberate indifference to the possibility that such failure

might exacerbate his medical condition.  It is well established that a public official's "deliberate

indifference to a prisoner's serious illness or injury" violates the Eighth Amendment's prohibition

Page 29 - FINDINGS AND RECOMMENDATION

against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To prevail on an Eighth Amendment deliberate indifference claim, a prisoner must establish both (i) that he suffered an objectively serious illness or injury while incarcerated and (ii) that prison officials were subjectively aware of the seriousness of the condition and deliberately denied or delayed access to medical care that could reasonably have been provided. *See Clement v. Gomez*, 298 F.3d 898, 904-905 (9th Cir. 2002). The objective component is satisfied "whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 904 (internal quotation marks omitted), *citing McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *quoting Estelle*, 429 U.S. at 104. Under *Estelle*, to establish a defendant's subjective deliberate indifference requires a showing "of something more than mere negligence," *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), rising to the level of "a purposeful act or failure to act on the part of the defendant" notwithstanding the defendant's knowledge that such act or failure to act was likely to harm the plaintiff, *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992).

Assuming *arguendo* that a finder of fact could reasonably conclude on the basis of the evidence of record that the failure of TRCI medical staff to provide Alexander with dietary fiber supplements free of charge could result in either "further significant injury" or "the unnecessary and wanton infliction of pain," and thus that there is at least a question of fact as to whether Alexander could satisfy the objective component of the *Estelle* standard, Alexander's claim or claims necessarily fail as a matter of law in connection with the subjective component, in that the evidence of record does not support the conclusion that any remaining defendant purposefully acted or failed to act in a manner calculated to cause Alexander to suffer harm -- including

through exacerbation of his symptoms – in failing to renew his fiber. First, the evidence

establishes that the decision not to provide Alexander with fiber supplements free of charge at

TRCI was made not by any named defendant but by the Therapeutic Level of Care Committee.

Second, defendant Gruenwald and other TRCI medical staff repeatedly advised and reminded

Alexander both that fiber supplements were available to him "on canteen" and that consumption

of vegetables available to him at no charge from the refectory would provide him with all the

fiber he needed for proper operation of his digestive system. Third, as set forth at length above,

Gruenwald and other TRCI medical staff were consistently responsive to Alexander's requests for

medical attention at all material times, treating his pain symptoms and medical needs as they

arose. Indeed, on more than one occasion TRCI medical staff prescribed dietary fiber

supplements for Alexander in response to his requests, including in June 2011, just two months

after the failure to renew that underlies Alexander's claims.

Because a finder of fact could not find on the basis of the evidence of record that the

April 2011 failure to renew Alexander's fiber constituted a breach "of constitutional proportions"

of the government's duty to provide medical care to an incarcerated prisoner, *Hutchinson*, 838

F.2d at 394, Gruenwald is entitled to summary judgment as to Alexander's claim and/or claims in

their entirety, and the court need not address Gruenwald's proffered alternative grounds for grant

of summary judgment. Moreover, for the same reason Alexander cannot pursue any claim

arising out of the same purported deprivation against defendant Hoefel, so that no party's

interests could be served by affording Alexander further opportunity either to perfect service of

process on Hoefel or to allege Hoefel's personal involvement in the April 2011 decision not to

renew Alexander's fiber supplements. In consequence, the court should enter final judgment on

Page 31 - FINDINGS AND RECOMMENDATION

Alexander's claims in all defendants' favor.

## CONCLUSION

For the reasons set forth above, Gruenwald's motion (#66) should be granted and summary judgment should be entered in favor of both remaining defendants. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately

/ / /

/ / /

/ / /

/ / /

/ / /

Page 32 - FINDINGS AND RECOMMENDATION

appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1)

of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.


Dated this 31st day of December, 2014.

Honorable Paul Papak
United States Magistrate Judge